**1054**

Stuart M. WECHSLER and Eric Rosenfeld, Plaintiffs-Appellants,

v.

Saul P. STEINBERG, Bernard L. Schwartz, Henry A. Sweetbaum, Frederick A. Jackson, John T. Leatham, Julius Steinberg, Robert B. Hodes, Thomas J. Stanton, Jr., Henry W. Meers, Touche, Ross, Baily & Smart, a partnership, and Leasco Data Processing Equipment Corporation, Defendants-Appellees.

No. 645, Docket 83–7630.

United States Court of Appeals, Second Circuit.

Argued Jan. 19, 1984.

Decided May 7, 1984.

Jared Specthrie, New York City (Arthur Wyler Mercado, Milberg, Weiss, Bershad,

Specthrie & Lerach, New York City, on brief), for plaintiffs-appellants.

Anthony F. Phillips, New York City (Philippe M. Salomon, Jeanne M. Luboja, Eric S. Hutner, Willkie, Farr & Gallagher, New York City, on brief), for defendant-appellee Leasco Data Processing Equipment Corporation and the individual defendants-appellees.

Rosenman, Colin, Freund, Lewis & Cohen, New York City (Arnold I. Roth, Arthur S. Linker, Alan L. Doochin, New York City, on brief), for defendant-appellee Touche Ross & Co.

Before FEINBERG, Chief Judge, and VAN GRAAFEILAND and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Class action plaintiffs Stuart M. Wechsler and Eric Rosenfeld appeal from a judgment of the United States District Court for the Eastern District of New York, Mark A. Costantino, *Judge*, dismissing their complaint charging defendants Leasco Data Processing Equipment Corp. ("Leasco"), certain of its officers and directors, and its auditors, Touche, Ross, Baily & Smart ("Touche Ross"), with having omitted or approved the omission of certain information from Leasco annual reports, in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982). The court granted defendants' motion for summary judgment on the ground that plaintiffs asserted no facts that could support a finding that defendants had acted with scienter. Plaintiffs contend that since there was a pretrial ruling that the materiality of the information omitted was an issue of fact, since defendants admitted that they knew the information and knew it had been omitted from the annual reports, and since there was circumstantial evidence from which scienter could be inferred, the court erred in ruling as a matter of law that there was no scienter. We agree.

## I. BACKGROUND

### A. *The Events*

In July 1968, Leasco sought to acquire control of Reliance Insurance Company ("Reliance") by means of an exchange offer in which 63,462 shares of Reliance Class A common stock and 164,430 shares of Reliance common stock would be exchanged for 799,050 units of Leasco securities ("Units"); each Unit consisted of one share of Leasco Series B convertible preferred stock and one half of a warrant to purchase one share of Leasco common stock. Under the terms of the exchange offer, Leasco arranged for the Reliance shareholders simultaneously to sell all of the Leasco Units they received in the exchange to institutional buyers (the "Institutional Buyers" or "Buyers") at the price of $72 per Unit, for a total purchase price of $57,531,600. At the same time, Leasco agreed to arrange for the resale of the Units by the Institutional Buyers within one year of the date of purchase, and it guaranteed that in the resale the Buyers would receive no less than their cost of $72 per Unit. In addition, Leasco agreed to pay the Institutional Buyers 75 cents per Unit for each month that the Buyers held the Units ("75–Cent Carrying Charge"). Both the exchange offer and the sale to the Institutional Buyers were consummated on September 19, 1968.

On December 20, 1968, Leasco issued its annual report for the fiscal year ended September 30, 1968 ("1968 annual report"). This report contained Leasco's financial statements for the year, as to which Touche Ross issued an unqualified opinion. The only reference in those financial statements to the transaction between Leasco and the Institutional Buyers was in note 13, entitled "Post Balance Sheet Events," which stated in relevant part as follows:

In connection with the acquisition of Reliance, Leasco entered into an arrangement with certain holders of Reliance stock whereby Leasco would exchange shares of Leasco Series B preferred stock and warrants for such Reliance stock and concurrently sell such securi-

ties to a group of buyers. Leasco agreed to arrange for the resale of the Leasco securities prior to September 20, 1969 and guaranteed that the buyers of the Leasco securities would receive not less than $72 for each unit, consisting of one share of preferred stock and ½ warrant, plus $.75 for each month that the unit is owned by the buyer. The agreement further provided that Leasco would receive a portion of the proceeds above such guarantee. If such sale had occurred on December 20, 1968 at then prevailing market prices, Leasco's participation in the proceeds of such arrangement would have been approximately $18,000,000.

Note 13 did not disclose the possibility that if Leasco decided to repurchase the Units, it would be required, under the terms of the guaranty, to pay the Institutional Buyers some $57,000,000. Moreover, this figure could not be computed from information contained in the 1968 annual report because the total number of Units to which the guaranty applied was nowhere revealed in the report.

Nor did note 12 to the financial statements, entitled "Commitments and Contingent Liabilities," refer to the transaction with the banks, notwithstanding Leasco's contingent obligation under the guaranty. In addition, neither note 12 nor note 13 revealed that the effect of the 75-Cent Carrying Charge would be to aggregate an expense to Leasco of more than $7,000,000 each year that the Buyers held the Units; this figure also could not be computed from reading the 1968 annual report because the report did not reveal the total number of Units involved in the transaction.

In December 1969, Leasco issued its annual report for the fiscal year ended September 30, 1969 ("1969 annual report"), as to whose financial statements Touche Ross issued an unqualified opinion. Once again, no reference to Leasco's guaranty to the Buyers was included in the note to the financial statements entitled "Commitments and Contingent Liabilities." The only reference to the arrangement appeared in note 11, entitled "Additional Paid-In Capital," which stated as follows:

In connection with the acquisition of Reliance, Leasco entered into an arrangement with certain holders of Reliance stock whereby Leasco exchanged shares of Leasco series B preferred stock and warrants for such Reliance stock and such holders concurrently sold such securities to a group of buyers. Leasco agreed to arrange for the resale of the Leasco securities prior to September 19, 1969, and guaranteed that the buyers of the Leasco securities would receive not less than $72 for each unit, consisting of one share of preferred stock and 1¼ warrants plus $.75 for each month that the unit was owned by the buyer. The agreement further provided that Leasco would receive a portion of the proceeds if any above such guarantee. In July 1969 Leasco entered into an amendment with owners of 75% of the units providing for the extension, with some modification, of the agreement until October 1, 1970. In September 1969, the balance of the units were placed with a new group of buyers on substantially the same terms. In connection with these arrangements Leasco paid the holders $7,272,000 representing $.75 for each month the units had been held, which amount has been charged to additional paid-in capital. If all the units had been sold on December 10, 1969 at their prevailing market prices, Leasco would have been required to pay an additional amount of approximately $16,000,-000.

Like note 13 in the 1968 annual report, this note failed to disclose the total number of Units held by the Buyers, and the full extent of Leasco's contingent liability thus could not be computed from information contained in the 1969 annual report. In addition, this note charged the 75-Cent Carrying Charge to additional paid-in capital instead of to expenses, which plaintiffs contend resulted in an overstatement of Leasco's pre-tax income.

On June 19, 1970, Leasco announced that it would repurchase some of the Units from the Institutional Buyers on June 29 for

$31.9 million (which included the 75-Cent Carrying Charge), and would repurchase the rest on October 1, 1970, at a somewhat higher price. Following the June 19 announcement, the market price of Leasco's Series B convertible preferred stock dropped.

### B. *The Proceedings Below*

Wechsler commenced this suit in 1972, charging the defendants with having conspired to violate § 10(b) of the Act by failing to disclose in Leasco's 1968 and 1969 annual reports the extent of the contingent liability created by Leasco's agreement with the Institutional Buyers and the true effect on Leasco's finances of the 75-Cent Carrying Charge. The complaint alleged that defendants' failure properly to disclose these facts in the annual reports fraudulently inflated the market prices of Leasco securities above their actual values, with the result that purchasers paid higher prices for their securities than they should have paid.

In 1974, shortly after Rosenfeld commenced a similar suit and the two actions were consolidated, defendants moved for summary judgment on four grounds. They contended that the annual reports were not misleading, that other public documents adequately disclosed the information in question, that treating the 75-Cent Carrying Charge as additional paid-in capital conformed with generally accepted accounting principles, and that plaintiffs had not relied on the documents they claimed were misleading. The court, Edward R. Neaher, *Judge*, denied the motion in an opinion dated February 11, 1976 ("1976 Opinion"). Observing that defendants conceded that the annual reports did not fully disclose the extent of Leasco's contingent liability, the court ruled that summary judgment was inappropriate because the question of materiality had been presented with "sufficient cogency to raise an issue for the trier of fact," 1976 Opinion at 9, and because it was

clear that genuine issues of fact existed as to the effect on the market of the various alleged disclosures and nondisclosures, *id.* at 13. The court declined to address the question of scienter, noting that plaintiffs had not yet completed their discovery of the defendants.

In 1981, following the completion of discovery, defendants again moved for summary judgment, arguing principally that, because the details of Leasco's arrangements with the Institutional Buyers were disclosed in other documents, defendants could not have acted with the required degree of scienter in disseminating the annual reports. In opposition, plaintiffs pointed out that the court (Neaher, *J.*) had already found that there was a triable issue as to whether the nondisclosures were material. In addition, they pointed to the deposition testimony of several of the defendants, which revealed that defendants had known the information that was not disclosed in the annual reports; to the deposition testimony of Leasco's Chairman that annual reports were important documents that he hoped the public would read; and to deposition testimony of Leasco's chief financial officer during the relevant period, to the effect that Leasco used an accounting treatment relating to the Reliance acquisition that was designed to permit the attribution of tens of millions of dollars of Reliance profits to Leasco, which defendants knew would have the favorable result of enabling Leasco to report more earnings per share. Finally, plaintiffs submitted the opinion of their expert that the accounting method chosen by Leasco with respect to the Reliance acquisition was plainly improper by generally accepted accounting standards, and that if Leasco had made full disclosure in the annual reports of the $57 million debt or liability, it could have impaired Leasco's ability to use this accounting method, which had the most favorable impact on its profits and earnings per share.[1]

---

**1.** As plaintiffs have used it, both in the district court and on appeal, the issue respecting the accounting treatment of the Reliance acquisi-

tion has relevance both to the issue of nondisclosure of the contingent liability in the annual reports and to the issue of defendants' motives

By opinion dated June 28, 1983 ("1983 Opinion"), Judge Costantino granted defendants' motion for summary judgment, stating as follows:

Plaintiffs argue that the defendants' actual knowledge of material facts allegedly omitted from the Annual Reports constitutes, by itself, *scienter* under rule 10b–5. Defendants respond that mere knowledge of material facts which are omitted from disclosure does not create a presumption of *scienter*. The court finds defendants' argument more persuasive.

... In the instant case, even after extensive discovery over a number of years, plaintiffs are still unable to set forth any facts which establish that the defendants intended to deceive the market by disseminating the allegedly inadequate Annual Reports. Rather, plaintiffs would have the court hold defendants to a standard resembling strict liability. This court declines to do so. Despite years of discovery, plaintiffs have simply failed to produce any evidence showing that omissions in the Annual Reports were made with the intent to deceive or defraud the market. Absent such a showing, there can be no violation of section 10(b) or of rule 10b–5....

In attempting to establish this requisite showing, plaintiffs argue that the disclosure by defendants in other documents of the material facts omitted from the Annual Report in itself, supports a finding of *scienter*. Plaintiffs argue that by deliberately inserting the same material facts allegedly omitted from the Annual Reports into other documents, the defendants thereby "made a conscious decision" to publish the facts in certain documents and withhold them from others. Plaintiffs contend that this behavior constitutes deliberate concealment of material facts. This court can find no support for such an argument. The plaintiffs' conclusory statement, in

and of itself, fails to demonstrate *scienter*.

1983 Opinion at 10–12.

Plaintiffs have appealed, contending essentially that since (1) the omissions from the 1968 and 1969 annual reports were material, (2) defendants possessed the information omitted and knew it had not been disclosed in the annual reports, (3) defendants hoped the annual reports would be read by the public, and (4) defendants deliberately used improper accounting methods to inflate the market price of Leasco stock, the disclosure of the information in other documents does not, as a matter of law, negate the possibility that defendants acted with scienter in omitting it from the annual reports. We conclude that plaintiffs have adduced sufficient evidence to show that there exists a genuine issue of fact as to scienter, and that the district court incorrectly found that there was no scienter as a matter of law. We therefore reverse and remand the case for trial.

## II. DISCUSSION

■ To prove scienter in a § 10(b) case, a plaintiff must demonstrate "knowing or intentional misconduct" on the part of the defendant, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976), or an "intent to deceive, manipulate, or defraud" investors, *id.* at 193, 96 S.Ct. at 1380. *Accord Aaron v. SEC*, 446 U.S. 680, 689–91, 100 S.Ct. 1945, 1951–1952, 64 L.Ed.2d 611 (1980). Proof of scienter need not be direct, but may be "a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

■ Issues of motive and intent are usually inappropriate for disposition on summary judgment. *See Poller v. Colum-*

for the nondisclosures. We see no merit in defendants' contention that this use is precluded by a 1978 stipulation that barred plaintiffs from

amending their present complaint to assert new claims or allegations or from commencing a separate action.

*bia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (antitrust); *Schoenbaum v. First-brook*, 405 F.2d 215, 218 (2d Cir.1968) (en banc) (§ 10(b)), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). In a § 10(b) action, a court may not grant such relief to the defendants on the ground of lack of scienter unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive. *See State Teachers Retirement Board v. Fluor Corp.*, 500 F.Supp. 278, 294 (S.D.N.Y.1980), *aff'd*, 654 F.2d 843 (2d Cir.1981).

The district court recognized these principles but, as it appears to have ignored most of the evidence submitted by plaintiffs in opposition to summary judgment, it did not properly apply them. Plaintiffs did not rely simply, as the district court suggested, on the proposition that the mere possession and nondisclosure of information constituted scienter. Rather, as set forth in Part I.B. above, they pointed to evidence competent to show not only that defendants possessed and chose not to disclose the information, but also that defendants were attempting by their choice of accounting methods to artificially increase the market price of Leasco shares, that the nondisclosures in the annual report were material and would have that inflationary effect, and that defendants hoped the public would read the annual reports.

This evidence is sufficient to support an inference, if a jury chooses to draw one, that defendants deliberately omitted material information from their annual reports with the intent to deceive investors and artificially inflate the price of Leasco stock. The fact that defendants may have later set forth all of the undisclosed information in other documents is a matter for argument to the jury, and it may be that after trial, a jury will find that defendants did not act with an impermissible intent in failing to include the information in the annual reports. The question of which inference should be drawn, however, is a matter for the jury. The determination that as a matter of law there was no scienter was improper on this record.

## CONCLUSION

The judgment of the district court is reversed, and the case is remanded for trial.